UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

HENRY ARGUDO and DIEGO SANAY, on behalf of themselves and others similarly situated

        Plaintiffs,

v.

PAREA GROUP LLC, d/b/a TRATTORIA IL MULINO, IMNY GS LLC d/b/a IL MULINO TRIBECA, GFB RESTAURANT CORP. d/b/a IL MULINO DOWNTOWN, WONDERFUL RESTAURANT LLC d/b/a IL MULINO UPTOWN, K.G. IM MANAGEMENT, LLC, PASTA PERFECT LLC, IM 60 STREET, IL MULINO USA, IM LLC-I, BRIAN GALLIGAN, and GERALD KATZOFF,

        Defendants.

18 CV 678 (JMF)

## DECLARATION OF JOSEF NUSSBAUM

I, Josef Nussbaum, under penalty of perjury, affirm as follows:

1. My name is Josef Nussbaum, and I am a partner with Joseph & Kirschenbaum LLP ("J&K"), Plaintiffs' counsel in the above-captioned matter. I am familiar with the facts and circumstances set forth herein.

2. I submit this declaration in support of Plaintiffs' motion for preliminary approval of a class action settlement.

### NATURE OF THE CLAIMS AND PROCEDURAL HISTORY

3. Plaintiff-Class Representatives' motion seeks preliminary approval of a settlement that will resolve all claims asserted in the instant action.

4. Plaintiffs and Class Members are current and former tipped food service employees (including servers, runners, bussers and bartenders) who—in the six years prior to the filing of the lawsuit—worked at five Il Mulino restaurants located in New York City.

5. On January 26, 2018, Plaintiffs filed this lawsuit against Defendants asserting, *inter alia*, that Il Mulino and its owners/operators Defendants Gerald Katzoff and Brian Galligan violated the Fair Labor Standards Act ("FLSA") and the New York Labor Law ("NYLL") by: (1) failing to pay employees for all hours they worked; (2) improperly taking a tip credit for the wages they paid to tipped employees, and, as a result, failing to pay tipped employees the minimum wage for all hours worked and the proper overtime premium for hours worked in excess of 40 in a week; and (3) failing to provide tipped employees with the appropriate wage notices and statements required under New York State's Wage Theft Prevention Act (the "WTPA").

6. Plaintiffs also alleged that Defendants improperly forced employees at the Trattoria Il Mulino location to share their tips with individuals who do not customarily receive tips.

7. The lion's share of the damages in the case centers around Plaintiffs' claim that Defendants were ineligible to apply the FLSA and NYLL tip credit to food service employees' hourly wages because Defendants failed to meet the statutory notice prerequisites, which must be followed in order to pay employees pursuant to a tip credit. *See* 29 U.S.C. § 203(m); N.Y. Comp. Codes R. & Regs. tit. 12 ("NYCRR"), § 146-1.3.

8. Most of the remaining damages stem from Defendants' failure to comply with the notice requirements of New York's WTPA which could have resulted in penalties of up to $10,000 per Class Member if the Class was successful at trial.

9. In December 2018, Defendants moved for partial summary judgment seeking a ruling that Il Mulino's owner, Gerald Katzoff, was not Plaintiffs' employer for the purposes of the FLSA and NYLL and that he should thus be dismissed as a Defendant in the lawsuit.

10. Contemporaneously with Defendants' motion, Plaintiffs moved to have the case certified as a class action pursuant to Fed. R. Civ. P. 23.

11. In September 2019, the Court ruled in Plaintiffs' favor on both these motions and certified a class of tipped food-service employees employed at Il Mulino employed between January 26, 2012 and the date of the Order certifying the Class ("Class Members"). *See Argudo v. Parea Grp. LLC*, No. 18-CV-0678 (JMF), 2019 U.S. Dist. LEXIS 163249 (S.D.N.Y. Sep. 24, 2019).

12. The Court also certified a subclass of tipped food-service employees employed at the Trattoria Il Mulino location (the "Subclass Members") for the purposes of Plaintiffs' N.Y. Lab. Law § 196-d claim only.

13. In addition, the Court appointed Joseph & Kirschenbaum LLP ("J&K" or "Class Counsel") as Class Counsel.

**DISCOVERY**

14. The parties had nearly finished full class-wide discovery by the time this case was resolved.

15. In discovery, Defendants produced class-wide payroll, clock-in, and tip records for the entire liability period, as well as the Named Plaintiffs' and opt-in Plaintiffs' personnel files and time records. Defendants also produced wage notification forms—to the extent they existed—that they alleged they had provided Class Members during the relevant statutory period.

16. Throughout the pre-certification and post-certification discovery periods, Defendants' previous and current counsel engaged Class Counsel in numerous in person, telephonic and email conversations to assist us in gaining a complete and accurate understanding of Defendants' payroll records.

17. In addition to the payroll records, Plaintiffs took a Fed. R. Civ. P. 30(b)(6) deposition of the corporate Defendants and depositions of the individual Defendants. At the time the Parties reached a settlement, Plaintiffs were also preparing to conduct a second deposition of the corporate Defendants.

18. Defendants deposed the two Named Plaintiffs and, at the time the case settled, the Parties were in the process of scheduling depositions of an additional eleven opt-in Plaintiffs.

19. Throughout the litigation, Class Counsel was also in regular contact with the Named Plaintiffs, Opt-in Plaintiffs and Class Members.

20. After thoroughly scrutinizing the payroll records, considering the extensive deposition testimony and frequent conversations with Class Members, Class Counsel were able to estimate the total potential damages in this case and to evaluate the strengths and weaknesses of the Class's claims.

21. The case settled shortly before the fact discovery deadline, which was set to occur on July 1, 2020. If the case had not settled, Plaintiffs were scheduled to file a motion for partial summary judgment on their tip credit and wage notice claims by July 17, 2020.

## MEDIATION AND SETTLEMENT NEGOTIATIONS

22. The Parties first attempted to formally resolve this matter in February 2020 by attending a full-day mediation with Mrs. Ruth Raisfeld, Esq., a well-known and well-respected mediator.

23. In addition to the Named Defendants and their attorneys, several representatives of a financial services company that finances Defendants' companies attended the mediation as well.

24. At the mediation, Defendants strongly contested almost all of the Class's legal and factual arguments. Defendants also made significant representations—supported by their lenders' representatives as well as by financial records they provided for Class Counsel to review—that the Restaurants were severely overleveraged, their financial status was strained and thus they would be unable to withstand a judgment in the amount that the Class was seeking.

25. While the Parties made significant progress towards a settlement at the mediation, they were unable to agree on a figure that would resolve this matter and the mediation concluded without a settlement being reached.

26. After the mediation, Defendants substituted their attorneys and the Parties continued to engage in hard-fought class-wide discovery. The Parties also continued to explore the possibility of a resolution.

27. Significantly, shortly after the mediation, the Covid-19 pandemic struck and Defendants' restaurants have been either completely closed or operating at very limited capacity since March 2020. Thus, Defendants' already strained financial situation was worsened, as they were severely over-leveraged and now bringing in close to no income to service their debt. Put simply, Defendants' ability to pay and/or withstand a large judgment became even more precarious.

28. Nevertheless, the Parties were able to continue to negotiate and, in late May 2020, finally agreed to settle the Class's claims for $2.5 million.

29. As part of the settlement, and in order to protect the Class from potential consequences of the Restaurants ultimately closing and/or becoming insolvent, Plaintiffs insisted that most of the settlement fund would be payable almost immediately.

30. Over the next several weeks, the Parties engaged in negotiations over certain terms of the agreement, such as the notice process and the precise formula to be implemented in distributing the settlement proceeds. The parties finally arrived at a consensus on all the terms of the agreement in early July 2020.

31. The $2.5 million dollar settlement amount is, of course, a compromise figure. It takes into account the Class's risks of establishing liability in light of disputes concerning the precise nature of the tip credit notices Defendants claim to have provided Class Members.

32. For example, in discovery, Defendants produced employee handbooks for which Class Members signed an "acknowledgment of receipt" forms and which, at times, set forth that Defendants intended to take a tip credit. Defendants would have relied on these handbooks and the "acknowledgment of receipt" forms to try and establish that, contrary to Class Members' contentions, employees were properly informed that Defendants were taking a tip credit.

33. In addition, Defendants indicated that they intended to argue that they are entitled to an affirmative defense under N.Y. Lab. Law § 198(1-b), which, they contend based on New York decisional law, provides a complete defense to the Class's WTPA wage notice claims and tip credit wage claims. *See Ahmed v. Morgans Hotel Grp. Mgmt., LLC*, 54 Misc. 3d 1220(A) (N.Y. Cnty. Feb. 27, 2017); *Ahmed v. Morgan's Hotel Grp. Mgmt., LLC*, 160 A.D.3d 555 (1st Dep't 2018). Specifically in the *Ahmed* case, the New York County Supreme Court held that the NYLL 198 (1-b) affirmative defense to WTPA violations was also applicable to claims that an employer was not entitled to take the tip credit against the minimum wage because the

6

employer provided improper notice of the tip credit. *Ahmed*, 2017 N.Y. Misc. LEXIS 638, at *13-14.  This ruling was ostensibly based on the similarity between the notice requirements an employer must meet before taking the tip credit, which are contained in the NYDOL's Hospitality Wage Order, and the wage notice requirements of N.Y. Lab. Law § 195(1). *See id*.

34. Plaintiffs here were prepared to argue that the *Ahmed* Courts simply got this issue wrong and that Defendants could not rely on any affirmative defense to their tip credit violation. *See, e.g., Marin v. Apple-Metro, Inc.*, No. 12 CV 5274 (ENV) (CLP), 2017 U.S. Dist. LEXIS 165568, *77 (E.D.N.Y. Oct. 4, 2017) ("[S]ince February 27, 2015, in an action brought under Section 198(1-b) to recover statutory damages for failure to provide proper wage notice, an employer may avoid liability by showing that . . . it made 'complete and timely payment of all wages due' to the employee who was not provided notice."). Nevertheless, the *Ahmed* decisions remained the only New York State courts to decide this state law issue and therefore Plaintiffs acknowledged they had some risk in overcoming this (incorrectly decided) precedent.

35. Finally, the settlement amount also took into account Defendants' financial position, especially considering the massive effect that the Covid-19 pandemic continues to inflict on the Restaurants.  Even before the onset of the pandemic, at the mediation, Defendants represented that if Plaintiffs and the Class were able to recover a full judgment against Defendants, it is unlikely the Class would be able to collect due to the size of Class's "best case scenario" damages as compared with Defendants' tumultuous finances.  Of course, since that time, the Restaurants' incomes have only decreased, and they are in an existential crisis in light of Covid-19 interruption and their inability to service their very large debts.  Thus, a judgment against Defendants in this case could have ultimately resulted in Defendants potentially closing their business, a result that would be highly detrimental to the Class, especially Class Members

who continue to be employed by Defendants. (*Id*. at 31.)  Taking these considerations into account, Plaintiffs insisted that Defendants fund most of the settlement payment before the Fairness Hearing ($1,000,000 in August and $500,000 in October) thus protecting the Class from the risks of Defendants' bankruptcy and/or other impediments to payment.

36. In sum, as Class Counsel intends to clarify in greater detail in their motion for final approval, the Class Representatives and Class Counsel believe that the settlement easily falls within the range of reasonableness because it achieves a significant benefit for the Class where failure at trial is possible. (*Id*. at 32.)

## TERMS OF THE SETTLEMENT

37. The Settlement Agreement provides that Defendants shall pay a maximum settlement amount of Two Million Five Hundred Thousand Dollars ($2,500,000.00) (the "Settlement Common Fund"). (Nussbaum Decl., Ex. A §§ 1.34, 3.1(A).)  The Settlement Payment includes awards to Class Members, service awards to the Class Representatives, attorneys' fees and costs, and reasonable Claims Administrator's fees.

38. Pursuant to the Settlement Agreement, the Net Settlement Fund ("NSF") shall be divided based on three categories of damages, namely: (1) the "Tip Credit Fund," which will account for 70% of the NSF, (2) the "WTPA Notice Fund" which will account for 25% of the NSF, and (3) the "Trattoria Subclass Fund" which will account for the tip disgorgement claim brought on behalf of the Subclass Members and which will account for 5% of the NSF.[1]  (*Id*. at § 3.4(B)(3).)

39. The Tip Credit Fund shall be further divided between Class Members who worked between January 26, 2012 and December 31, 2014 ("Period A") and Class Members who

---

[1] As defined in § 1.22 of the Settlement Agreement, the "Net Settlement Fund" means the remainder of the Settlement Payment after deductions for Court-approved (1) fees and costs for the Settlement Claims Administrators; (2) attorneys' fees and costs for Class Counsel; and (3) service awards to the Named Plaintiffs.

worked between January 1, 2015 to the end of the Relevant Statutory Period ("Period B"). (*Id*. at § 3.4(B)(3)(a)(i)-(ii).) This is because Defendants only have access to payroll records from 2015 and onwards and thus Class Members who worked for Defendants during Period A (*i.e.*, prior to 2015) will divide the their portion of the Tip Credit Fund on the basis of days that they were employed by Defendants. Conversely, Class Members who were employed by Defendants at any time after January 1, 2015 will have their portion of the Tip Credit Fund computed based on the amount of hours each Class Member worked for Defendants at the tip credit minimum wage during Period B.

40. The Parties have designated Rust Consulting as the proposed Settlement Claims Administrator. (*Id*. at § 1.6.) The Settlement Claims Administrator's reasonable fees and costs will be paid from the Settlement Payment. (*Id*.) Arden Claims Service estimates that their claims administration fees will not be in excess of $15,000.00.

**EXHIBITS**

41. Attached hereto as Exhibit A is a true and correct copy of the Settlement Agreement and Release.

42. Attached hereto as Exhibit B is a true and correct copy of the proposed Class Notice.

43. Attached hereto as Exhibit C is a proposed order.

Dated: July 16, 2020                                                                    /s/ *Josef Nussbaum*
                                                                                                    Josef Nussbaum